## CIRCUIT COURT OF FAIRFAX COUNTY

Gordon MacDougall et al.

v.

The Hartford Ins. Group et al.

Case No. (Law) No. 197637

February 19, 2003

BY JUDGE ARTHUR B. VIEREGG

On March 18, 2000, a tragic multi-vehicle collision occurred on I-395. In order to resolve coverage issues, to promote the possible settlement of claims, and to avoid costly, protracted litigation, plaintiffs and the defendant insurance companies have stipulated the relevant issues and facts in order that this Court might afford the parties a decision declaring the coverage provided by certain of the policies. The parties have briefed and orally argued the

issues. During oral arguments on February 6, 2003, stipulations that the Court might additionally consider deposition testimony of Benavidez, correspondence between counsel with regard to the fourth issue addressed in this letter opinion, and certain exhibits attached to the Landmark's brief were made. My decisions are set forth in this letter opinion.[1]

## I. *Facts*

### *The Accident*

On March 18, 2000, Edgardo Benavidez, an employee of Owen & Sparrow, Inc., and OSA Waste, L.L.C. (collectively "Owen & Sparrow"), drove a company dump truck north on Interstate 395. The truck was struck on the left side by an automobile driven by James Richardson, causing Benavidez to lose control of the truck. The truck veered left across three lanes of traffic, vaulted over the guardrail separating northbound from southbound traffic and landed atop two vehicles traveling southbound on Interstate 95. The drivers and three passengers in these cars were killed. Two minors survived with serious injuries.

James Richardson drove a car owned by Sandra Reardon. Benavidez drove a truck owned by American Equipment Leasing but leased to Benavidez's employer, Owen & Sparrow. Benavidez had worked for Owen & Sparrow as a dump truck driver since 1999. On March 18, 2000, when the accident occurred, he was proceeding to Old Dominion Drive in Arlington County to pick up a container. Only for purposes of deciding the issues relating to coverage, the parties have stipulated that Reardon, Benavidez, and Owens & Sparrow are liable for the deaths and injuries suffered in the accident.

Scott Klurfeld owned and drove one of the cars involved in the accident, a Saab 900S model. Both his wife, Janis Klurfeld, and he were killed. Their son, Zachary Klurfeld, and his friend, George MacDougall, both minors, survived but sustained serious injuries. Russell Surratt owned and drove the second car involved in the accident. It was crushed by the Owen &

---

[1] Four discrete issues have been presented to me for decision. Chief Judge Michael P. McWeeney has assigned other issues to Judges Jane Marum Roush and Robert W. Wooldridge for decision. In this letter opinion, I have accordingly only set forth those facts related to the accident and the insurance policies necessary to decide the issues assigned to me.

Sparrow truck. Surratt, his wife, Inna Surratt, and another passenger, Jacqueline Ernst, were all killed.

*Insurance Policies*

Sandra Reardon owned a State Farm liability insurance policy with coverage of $50,000/$100,000 for the Reardon Car.[2] James Richardson owned a State Farm liability insurance policy with coverage of $25,000/$50,000 for two vehicles, neither of which was involved in the accident. Richardson is an underinsured motorist as to the claims against him.

Owen & Sparrow was the named insured on a United Pacific Insurance Company policy providing $1 million in auto liability coverage. It afforded such coverage not only to Owen & Sparrow but also Benavidez as a permissive driver of his employer's vehicle. United Pacific Insurance Company is a subsidiary or division of Reliance Insurance Company. Owen & Sparrow and Benavidez were also insured by a $2 million Reliance Excess-Umbrella policy. Reliance Insurance Company, and its subsidiaries or divisions, however, are now insolvent and subject to liquidation by a Pennsylvania court. On October 3, 2001, the Commonwealth Court of Pennsylvania entered an Order of Liquidation declaring Reliance Insurance Company and its subsidiaries to be insolvent and appointing M. Diane Koken, Insurance Commissioner of the Commonwealth of Pennsylvania, to oversee the liquidation of Reliance.

American Equipment Leasing was insured by a Landmark Insurance Company excess liability policy. Joint Document Exhibit No. 20. Defendants Erie, GEICO, and USAA contend that this policy provided $3,000,000 in additional liability coverage for the truck. Landmark argues that neither Owen & Sparrow nor the truck were covered by the policy, and therefore, Benavidez, as a permissive user, was not covered. Landmark contends that, even if Benavidez's use of the truck were covered, such coverage could not exceed the minimum financial responsibility limits of Virginia.

Scott Klurfeld owned an Erie Insurance Company auto liability policy insuring the Klurfeld car and providing UM/UIM coverage[3] of $300,000 per

---

[2] When the amount of coverage is denoted $XX/$XX, the amount before the backslash refers to the coverage amount for one person, and the amount after the backslash refers to the coverage for two or more persons in the same accident.

[3] One of the issues before me is whether or not Va. Code § 38.2-2206(A) mandates separate UM and UIM coverages of up to the amount of a Virginia auto

person and $300,000 per accident. Klurfeld and his wife also were named insureds on an Erie Personal Catastrophe Policy providing them $1 million in excess liability coverage.

*Statutes and Specific Policy Provisions*

The issues under consideration implicate (1) several Virginia statutes, and (2) insurance policy provisions contained in the Klurfelds' Erie Personal Catastrophe Policy, Benavidez's GEICO policy, and American Equipment Leasing's Landmark Insurance Company liability policy. To the extent necessary, pertinent portions of these statutes and policies have been set forth in the sections of this letter opinion addressing the specific issues to which those statutes and policies relate.

II. *Analysis and Decisions*

A. *Whether or Not Virginia Code § 38.2-2206(A) Mandates Separate UM and UIM Coverages in Virginia Liability Policies, Each in Amounts Equal to the Liability Coverage of Those Policies*

*Overview*

All parties recognize that pursuant to Va. Code § 38.2-2206(A), Virginia auto liability policies afford an insured UM and UIM coverage in the amount of the liability policy. The limit of the UM coverage is the face amount of the policy, unless the insured affirmatively opts against such coverage. Plaintiffs, however, contend that § 38.2-2206(A) affords separate UM and UIM coverages, each up to the policy amount.[4] Plaintiffs thus contend that such an insured, injured by the concurring negligence of both uninsured and underinsured motorists, may potentially receive UM benefits of up to the policy amount and also UIM benefits of up to that amount. On the other hand, Erie, GEICO, and USAA contend that the combined UM and UIM coverage required by § 38.2-2206(A) may not together exceed the amount of the insured's liability policy coverage. The only reported Virginia decision addressing this issue is apparently the letter opinion of the Honorable

---

liability policy. The use of the term, "UM/UIM" is used merely to demonstrate that both UM and UIM coverage is potentially provided by the policy referred to.

[4] The Virginia Guaranty Fund supports this position. Heiden letter to me of January 13, 2003.

Joanne F. Alper of the Arlington Circuit Court in *O'Neil v. United States Automobile Association*, 57 Va. Cir. 257 (2002).

VA. CODE § 38.2-2206(A)

The issue before me turns on the interpretation of § 38.2-2206(A). Each of its constituent sentences material to the issue before me are singly set out in pertinent part below.

First Sentence:

> [N]o [auto liability] policy shall be issued or delivered in this Commonwealth to the owner of such vehicle or shall be issued or delivered to any insurer licensed in this Commonwealth upon any motor vehicle principally garaged in or used in this Commonwealth *unless it contains an endorsement or provisions* undertaking to pay the insured all sums that he is legally entitled to recover as damages from the owner or operator or an uninsured motor vehicle, within limits of not less than the requirements of § 46.2-472 [$25,000 coverage for death or injury to one person in any one accident, and $50,000 for such death or injury to two or more persons].

(Emphasis by italics.)

This first sentence of § 38.2-2206(A) thus requires Virginia liability policies to include "*an endorsement or* [set of] *provisions*" affording certain minimum UM coverage to those insured under such liability policies. I shall hereafter refer to this first sentence of the statute as the "UM Endorsement Requirement Sentence."

Second Sentence:

> Those limits shall equal but not exceed the limits of the liability insurance provided by the policy [unless such UM insurance is rejected by the named insured].

This second sentence thus at least provides that the liability insurer's mandated UM coverage created by the UM Endorsement Requirement Sentence is limited to the liability policy amount unless such UM coverage was expressly rejected by the insured, a circumstance not pertinent to this case. I shall hereafter refer to this second sentence of the statute as the "UM Insurance Limitation Sentence."

Fourth Sentence:

> *The endorsement or provisions* shall *also* obligate the insurer to make payment for bodily injury . . . caused by the operation or use of an underinsured motor vehicle to the extent the vehicle is underinsured, as defined in Section B of this section.[5]

(Emphasis by italics.)

This fourth sentence thus additionally obligates an auto liability insurer, *pursuant to the endorsement or provision required by the UM Requirement Sentence*, also to pay its insured for bodily injuries caused by an underinsured motorist. I shall hereafter refer to this fourth sentence as the "UIM Payment Sentence."

Fifth Sentence:

> *The endorsement or provisions* shall *also* provide for at least $20,000 coverage for damage or destruction of the property of the insured in any one accident but may provide an exclusion of the first $200 of the loss or damage where the loss or damage is a result of any one accident involving an unidentifiable owner or operator of an uninsured vehicle.

(Emphasis by italics.)

This fifth sentence tracks the language of the fourth sentence. It obligates the insurer, *pursuant to the endorsement required by the UM Requirement Sentence*, also to pay for damage or destruction of the insured's property caused by an uninsured vehicle. I shall hereafter refer to this fifth sentence as the "UM Property Damage Payment Sentence."

*Analysis and Decision*

1. *The Plain Meaning of the Statute Governs Its Interpretation*

In *O'Neil*, Judge Alper held that the interpretation of § 38.2-2206(A) should be gleaned by reference to the plain meaning of the statute's language.

---

[5] § 38.2-2206(B) defines an underinsured motor vehicle as "when, and to the extent that, the total amount of bodily injury and property damage liability insurance applicable to the operation or use of the motor vehicle and available for payment . . . *is less than the total amount of uninsured motorist coverage* afforded any person injured as a result of the operation or use of the vehicle." (Emphasis added.)

The General Assembly's intent in enacting a statute must, if possible, be gleaned from the plain meaning of the words used without resort to rules of statutory construction, unless a manifest absurdity would eventuate. *See O'Neil*, 57 Va. Cir. 257 at 261, citing, *inter alia, Abbott v. Willey*, 253 Va. 88, 91, 479 S.E.2d 528 (1997). And, in determining the plain meaning of a statute, all words of the statute must be given meaning and effect. *Haislip v. Southern Heritage Ins. Co.*, 254 Va. 265, 269, 492 S.E.2d 135 (1997). I wholly subscribe to Judge Alper's plain meaning approach. That said, in applying these principles, I reach a diametrically different interpretation of § 38.2-2206(A) than she did in *O'Neil*.

### 2. The Plain Meaning of § 38.2-2206(A)

Only one endorsement or set of provisions for either uninsured or underinsured motorist coverage is referred to in the statute. That endorsement is contained in the first sentence of the statute, the UM Endorsement Requirement Sentence. That Sentence statutorily requires that Virginia auto liability policies include "an endorsement or provisions" affording UM coverage to pay for bodily injuries caused by uninsured motorists. The fourth sentence of the statute, the UIM Payment Sentence, mandates that "the endorsement and provisions," i.e., the UM Endorsement Requirement Sentence, "also" shall "obligate the insurer" to pay for bodily injuries caused by underinsured motorists. Therefore, the fourth sentence, the UIM Payment Sentence, does not require a separate second endorsement and set of provisions requiring UIM coverage. Rather, it expressly provides that the scope of the UM Endorsement Requirement Sentence be expanded also to mandate UIM coverage as well as UM coverage. Similarly, the UM Damage Payment Sentence expands the mandated UM Endorsement Requirement Sentence to cover property damage in addition to bodily injury.

This interpretation is confirmed by the General Assembly's employment of the adjective or article, "the," before the word, "endorsement," in the statute's fourth sentence. Use of that definite adjective or article, and not the indefinite adjective or article "an," denotes "specified people or things." *The American Heritage Dictionary of the English Language*, 1981 Edition, at 1333. The only "endorsement" or "set of provisions" theretofore referred to in § 38.2-2206(A) is found in the UM Endorsement Requirement

Sentence.[6] Accordingly, the "endorsement" found in the UIM Payment Sentence can only refer to the endorsement mentioned and mandated by the UM Endorsement Requirement Sentence.

Since a liability insurer's statutory obligation to pay for bodily injuries caused by both uninsured and underinsured motorists arises under only one endorsement or set of provisions, the UM Endorsement Requirement Sentence, all insurance coverage mandated by the UM Endorsement Requirement Sentence is modified and limited by the UM Insurance Limitation Sentence that immediately follows it. Therefore, UM and UIM coverage thus mandated by the UM Endorsement Requirement Sentence is expressly modified by the UM Insurance Limitation Sentence that follows it: to limit all UM and UIM coverage to the face amount of the policy.

The supposition that a separate UIM coverage was intended is also refuted by common sense. If the UIM Payment Sentence were intended to create a separate UIM endorsement, limited as Plaintiffs contend by the liability policy amount, it would logically be expected that the limitation similar to that embodied in the UM Limitation Clause, would have been placed after the UIM payment sentence.[7] This follows, as it would be absurd to assume that the General Assembly would limit a liability insurer's mandated UM coverage but not a separate mandated UIM coverage. It is therefore manifest that the UM Insurance Limitation Sentence and the UIM Payment Sentence each modifies the only mandated coverage endorsement or set of coverage provisions in the statute, the UM Endorsement Requirement Sentence.

From all of the above, I conclude that Va. Code § 38.2-2206(A) creates but one mandated endorsement or set of provisions in a Virginia auto liability policy, the UM Endorsement Requirement Sentence. I further conclude that the UM and UIM coverage mandated may not when aggregated exceed the liability policy amount by virtue of the UM Insurance Limitation Sentence. Conversely, I conclude that separate UM and UIM coverages, each up to the amount of an insured's liability policy, were not intended or mandated by the General Assembly's enactment of § 38.2-2206(A).

---

[6] Since no other endorsement or provisions are thereafter mentioned in the statute, in the UM Endorsement Requirement Sentence, the indefinite adjective or article "an," is placed before the word "endorsement."

[7] In either case, it would logically be expected that the UM Insurance Limitation Sentence, whether placed after what is now the fourth sentence or essentially repeated after what is now the fourth sentence, would have been restated to refer to the separate UIM insurance coverage.

Finally, the Plaintiffs refer this Court to Justice Lemons's statement in *Kramer v. Commonwealth*, 263 Va. 128, 132, 556 S.E.2d 761 (2002), interpreting a provision of the Commonwealth's Risk Management Plan that afforded UM and UIM protection for certain Virginia employees injured in the scope of their duties. That Plan, unlike Va. Code § 38.2-2206(A) prescribed separate UM and UIM coverage limitations:

> Coverage applies to uninsured motorists exposures pursuant to Section 2.1-526.6(C) of the Code of Virginia. *Coverage is limited to $25,000 per person in any one accident, $50,000 for two or more persons in any one accident, and $20,000 for damages to or destruction of property of others in any one accident. Underinsured motorists coverage is limited to $50,000 per person.*

263 Va. at 130-31 (emphasis added). In denying the added contention that the UM and UIM coverages should be aggregated and paid to the estate of a State employee killed by an uninsured motorist, Justice Lemons stated "Uninsured coverage under the Plan is separate and distinct from underinsured coverage." 263 Va. at 132. Plaintiffs, while recognizing that Justice Lemons was addressing coverage provisions in the Commonwealth's Risk Management Plan that plainly differ from the coverage limitations in Va. Code § 38.2-2206(A), emphasize that Justice Lemons nevertheless declared that the UM and UIM coverages under the Plan were "separate and distinct." The thrust of the Plaintiff's argument is that since UM and UIM coverages are "separate and distinct" for purposes of the Plan, since the definitions of UM and UIM motorist's negligence in the Plan were derived from the definition of those terms in § 38.2-2206(B), that it is at least suggestive that all provisions related to UM and UIM coverage necessarily are separate and distinct. I read Justice Lemons's "separate and distinct" language to be addressing why both UM and UIM cannot be aggregated and paid to the victim's estate. By definition, UM and UIM motorists are similar but different risks, which for purposes of the Plan were accorded different coverages. However, while § 38.2-2206(A) also requires both of these different coverages (by virtue of the UM Endorsement Requirement Sentence), the statute (unlike the plan) contains only one limitation, and that limitation pertains to both the UM and the UIM coverages mandated by the endorsement found in the statute's first sentence.

### 3. O'Neil

Since *O'Neil* apparently represents the only Virginia authority, persuasive or controlling, as to the issue before me, it is also useful to address certain logical infirmities in *O'Neil*.

In support of her interpretation of § 38.2-2206(A), on page 261 of *O'Neil*, Judge Alper paraphrased and quoted portions of the statute as follows:

> Section A of the statute states that no insurance policy shall be issued in the Commonwealth unless the policy contains *provisions* Ato pay the insured all sums that he is legally entitled to recover as damages from the owner or operator of an uninsured vehicle . . .[8] and *shall also* obligate the insurer to make payment for bodily injury or property damage caused by the operation or use of an underinsured vehicle.'

*O'Neil*, 57 Va. Cir. 257, 261 (emphasis added by italics). Significantly, by use of ellipses, Judge Alper failed to quote the express language of the UM Insurance Limitation Sentence. And, in the course of her opinion, she both failed to interpret that second Sentence and failed to interpret the statute as a whole in light of its placement. And so, she determined that the General Assembly had intended to create two separate coverage requirements: one for UM coverage and the other for UIM, both of which she concluded were limited by the amount of the liability policy in which the UM and UIM coverage was mandated by § 38.2-2206(A). But she failed to explain how separate limitations up to the policy amount were intended by the language employed by the General Assembly.

Judge Alper's decision was to some extent also dictated by another aspect of her above-quoted restatement of § 38.2-2206(A). In the above quoted passage from *O'Neil*, Judge Alper initially paraphrased the statute by employing the paraphrased introductory plural term, "provisions," instead of the complete statutory phrase "endorsement or provisions," actually used. This created the false impression that the General Assembly had specified two parallel "provisions" of equal dignity: one for UM coverage and a second for UIM coverage. For the reasons discussed earlier in this opinion, however, it is plain that the General Assembly intended but one endorsement mandating both UM and UIM coverage, not two sets of provisions.

While Judge Alper may merely have intended to refer to the first and fourth sentences of the statute as "provisions" in the generic sense, the choice

---

[8] The ellipses omit the UM Insurance Limitation.

of the word "provisions" was problematic given the General Assembly's use of the term in the statute's first, fourth, and fifth sentences, in each case to referring to the "endorsement and provisions" contained in the UM Endorsement Requirement Clause. Setting forth the statute's language in that way not only suggested that two independent coverage endorsements or sets of coverage provisions were intended, but it also obscured the fact that the UIM coverage could only arise under the only endorsement and provisions mandated by the statute.

The linchpin of *O'Neil* was that the General Assembly's use of the term, "also," in the UIM Payment Sentence, necessarily indicated a legislative intent to create two separate insurance requirements. As used in the UIM Payment Sentence, however, "also" would only seem to mean "in addition to." Thus, in context, "also" thus logically indicates that the UM Endorsement Requirement Sentence would provide UIM coverage obligations (created by the UIM Payment Sentence), in addition to the UM payment obligations (otherwise mandated by the UM Endorsement Requirement Sentence). But it does not state or necessarily imply that such coverage would be subject to a separate limitation or subject to the same limitation as that contained in the UM Insurance Limitation Sentence.

Finally, I would strongly emphasize that the degree to which Judge Alper and I differ in interpreting this statute is modest. This case presents one of those situations in which slight linguistic differences have significant interpretive consequences. In a sense, the effects of these slightly differing interpretations are analogous to the significant results that the placement of a comma can have in the meaning of a contract or a statute. Here, the distinction between (1) the existence of two separate required endorsements, one for UM coverage and another for UIM coverage and (2) one endorsement requiring both UM and UIM coverages is not great. Plainly the General Assembly attempted to rectify its prior failure to require UIM coverage to cover those situations in which a person was injured or killed by a motorist with insufficient liability coverage by mandating such coverage. *See, Nationwide Mut. Ins. v. Scott*, 234 Va. 573, 363 S.E.2d 703 (1988). The question is not whether or not separate UM and UIM coverages, which are different but related, were required. Rather, the question is whether or not the General Assembly intended to cap these coverages, jointly or separately.

At page 261, *O'Neil* holds that, because separate UM and UIM coverages were intended by the General Assembly, it was unnecessary to interpret the limitation contained in the statute's UM Insurance Limitation Sentence. However, as addressed above, the pivotal positioning of that sentence, as well as the absence of a similar clause related to the UIM

Payment Sentence, inexorably leads to the conclusion that separate coverages, *both* limited by the amount of the policy, were not intended. Indeed, to conclude, as *O'Neil* does, that the UIM Payment Sentence created UIM coverage wholly separate from the type and amount required by the UM Endorsement Requirement Sentence, one might conclude that the General Assembly intended the UM coverage to be limited, but intended that the UIM coverage not be limited, a plainly unreasonable result. Because UIM coverage is calculated with respect to each underinsured vehicle, the Plaintiff's position would eventuate in UIM insurance, limited only by the number of underinsured vehicles negligently driven so as to cause a bodily injury or death.

In *Nationwide Mut. Ins. v. Scott*, 234 Va. 573, 363 S.E.2d 703 (1988), the Supreme Court held that UIM coverage required by § 38.2-2206(A) is to be calculated with respect to each vehicle driven by a driver at fault in causing an accident. *Scott* does not explicitly address the UM/UIM limitation issue before this Court.[9] In this case, subject to other insurance coverage decisions to be made, it would appear that Richardson was an underinsured motorist, and Benavidez was either an uninsured or an underinsured motorist. However, from the perspective of the liability of a UM/UIM carrier, it is irrelevant whether or not Richardson and Benavidez were both uninsured, both underinsured, or one uninsured and the other underinsured. The total coverage mandated for UM and UIM coverage, in the language of the second sentence of § 38.2-2206(A), could "equal but not exceed the limits of" the liability insurance of the policy involved. In circumstances such as those before this Court. There, of course, is an issue how the UM/UIM coverage is to be allocated to the accident victims. That issue is not one submitted to me for decision.

B. *Whether or Not the Erie Personal Catastrophe Policy Afforded UM/UIM Insurance to Those Covered by It*

*Overview*

Scott and Janis Klurfeld's Personal Catastrophe Liability Policy No. Q272350037 ("PCL Policy"), issued by the Erie Insurance Group, provided $1 million of insurance coverage broadly protecting them from personal

---

[9] Although the *Scott* decision was consistent with the foregoing interpretation of § 38.2-2206(A), i.e., that § 38.2-2206(A) requires UM and UIM coverage under the UM Endorsement Requirement Sentence up to but not beyond the liability policy limits. *See, Pilot Life Ins. Co. v. Crosswhite*, 206 Va. 558, 561, 145 S.E.2d 143 (1965).

liability. Erie Insurance Company contends that the PCL Policy terms exclude UM/UIM insurance coverage for the Klurfelds. Plaintiffs contend that § 38.2-2204(D) precludes Erie from denying such UM/UIM coverage as mandated by Virginia Code § 38.2-2206(A).

## *The PCL Policy*

The PCL Policy purports to afford broad liability. Thus, it provides in pertinent part:

> *We* pay the *ultimate net loss* which *anyone we protect* becomes legally obligated to pay as damages because of *personal injury* or *property damage* resulting from *an occurrence* during this policy period. . . . This applies only to damages in excess of the underlying limit. . . .

Joint Exhibit 4, at 4.

The PCL Policy also contains a section limiting Erie Insurance Group's liability. It states as follows:

> LIMIT OF LIABILITY: Regardless of the number of people we insure, claims made, or persons injured, our total payment under this policy is subject to the limits of liability shown on the Declarations. . . . *We will be liable only for the ultimate net loss in excess of the: (1) applicable limits of underlying insurance* collectible by anyone we protect, or (2) amount shown on Declaration as self insured retention,[10] if the occurrence is not covered by underlying insurance.
>
> The limits of underlying insurance apply regardless of (1) any defense which an underlying insurer may assert because of the failure of anyone we protect to comply with any conditions of the policy after an occurrence, or (2) the inability of the underlying insurer to pay because of bankruptcy or insolvency.

(Emphasis added by italics.)

A review of this provision reveals that it does not generally purport to exclude liability coverage arising out of operation of an automobile. The

---

[10] The Policy provides in the Declarations that there is no "self insured retention." Joint Exhibit 4.

"underlying limit," in the last sentence of the above-quoted portion of the Limitation of Coverage Provision, refers to "liability insurance coverage provided under policies shown on *Declarations* of this policy, for the limits and periods shown. . . ." Joint Exhibit 4 at 3. The "Declarations" form is defined as the form which shows the insureds' "coverages, limit of liability, premium charges, and other information." *Id.* It is deemed part of the policy." *Id.*

The Declarations indicate that at the time of the accident, the Klurfelds carried Erie Insurance Group liability insurance of $300,000/$300,000 for the operation of two autos, including their 1993 Saab 900S automobile involved in the subject accident, and an equivalent amount of UM/UIM coverage. Joint Exhibit 3.

The PCL Policy, however, sets forth the following condition of its coverage:

> (9) *MAINTENANCE OF UNDERLYING INSURANCE*
> *You* are required to maintain in full effect during the policy period, without alternation, the policies shown on the *Declarations* and/or *Amended Declarations* as *underlying insurance.* . . . If *you* fail to comply with this requirement, this policy shall apply in the same manner it would have applied had such policy(ies) been so maintained in force. . . .

Joint Exhibit 4 at 7.[11] This will hereinafter be referred to as the "PCL Policy Maintenance Clause."

The PCL Policy also contains exclusions limiting the Erie Insurance Group's potential liability, including exclusion number thirteen, which reads in pertinent part:

> *We* do not cover. . . .
> (13) *personal injury* to *you* and, if residents of *your* household, *your* relatives. . . .

Joint Exhibit 4 at 4.

*Relevant Virginia Statutes*

The following Virginia statutes are relevant to this issue. Virginia Code § 38.2-2206(A) provides in pertinent part:

---

[11] Essentially, the same language appears on the PCL Policy Declarations.

Except as provided in subsection J of this section, no policy or contract of bodily injury or property damage liability insurance relating to the ownership, maintenance, or use of a motor vehicle shall be issued or delivered in this Commonwealth to the owner of such vehicle or shall be issued or delivered by any insurer licensed in this Commonwealth upon any motor vehicle principally garaged or used in this Commonwealth unless it contains an endorsement or provisions undertaking to pay the insured all sums that he is legally entitled to recover as damages from the owner or operator of an uninsured motor vehicle, within limits not less than the requirements of § 46.2-472. . . .

Virginia Code § 38.2-2206(J) provides:

Policies of insurance whose primary purpose is to provide coverage in excess of other valid and collectible insurance or qualified self-insurance may include uninsured motorist coverage as provided in subsection A of this section. Insurers issuing or providing liability policies that are of an excess or umbrella type or which provide liability coverage incidental to a policy and not related to a specifically insured motor vehicle shall not be required to offer, provide, or make available to those policies uninsured or underinsured motor vehicle coverage as defined in subsection A of this section.

Virginia Code § 38.2-2204(D) provides in pertinent part:

Any endorsement, provision, or rider attached to or included in any such policy of insurance which purports or seeks to limit or reduce the coverage afforded by the provisions required by this section shall be void.

### Analysis and Decision

The Plaintiffs argue that Va. Code § 38.2-2206(A) requires insurers writing Virginia liability policies (policies covering liability for "bodily injury or property damage liability insurance relating to the ownership, maintenance, or use of a motor vehicle . . . principally garaged or used in [the] Commonwealth"), to afford UM/UIM coverage in the amount of a liability

policy; and that, since the Erie PCL Policy's Maintenance Clause required[12] the Klurfelds to maintain their auto liability policy on their Saab 900S involved in the accident, that Erie was required to furnish $1 million in UM/UIM coverage, the amount of the PCL Policy.

Erie, however, argues that such UM/UIM insurance is not mandated because the PCL Policy is an excess policy and by the express language of the second sentence of § 38.2-2206(J) is exempted from the UM/UIM requirement contained in § 38.2-2206(A). Since the PCL Policy plainly is an excess policy, as the Limitation of Coverage Provision explicitly states,[13] the critical inquiry is whether or not the second sentence of § 38.2-2206(J) exempts the PCL Policy from providing UM/UIM coverage as Erie contends. The first sentence of § 38.2-2206(J) permissively allows an excess liability carrier to provide UM/UIM coverage. However, the Erie PCL Policy does not purport to do so. Nor do the Plaintiffs argue that it does, separate and apart from the requirements of § 38.2-2206(A).

The second sentence of § 38.2-2206(J) states that "insurers issuing or providing liability polices that are of an excess *or* umbrella type or which provide liability coverage incidental to a policy and not related to a specifically insured motor vehicle, shall not be required" to provide UM/UIM coverage.

Plaintiffs argue that, since the Klurfelds were required to obtain and maintain their Erie auto liability policy on their Saab 900S in accordance with the PCL Policy Maintenance Clause, that the PCL Policy was "related to a specifically insured motor vehicle." While the plaintiffs concede, as they must, that § 38.2-2206(J)'s second sentence exempts certain excess policies, they argue that it does not exempt excess policies that are "related to a specifically insured motor vehicle" and that, since the PCL Policy was related to a specifically insured motor vehicle, it is not exempt from the requirement that the policy also afford UM/UIM coverage in the face amount of the $1 million excess policy.

---

[12] Although the Erie auto liability policy referred to on the Declarations was required for the issuance of the Erie PCL Policy, the Klurfelds' failure to maintain the policy did not vitiate coverage. Instead, it merely limited Erie's coverage to that if the auto policy had been maintained. *See,* PCL Policy Maintenance Clause.

[13] It states: "Erie will be liable only for the ultimate net loss in excess of the (1) applicable limits of underlying insurance collectible by anyone we protect. . . ." And the policy otherwise provided that it "applied only to damages in excess of the underlying limit."

The flawed premise that lies at the heart of Plaintiff's argument is that the § 38.2-2206(J) language under consideration makes a distinction between excess policies that do or do not relate to a "specifically insured motor vehicle." A closer inspection of § 38.2-2206(J)'s second sentence discloses that it exempts all excess policies from providing UM/UIM coverage and other insurance policies that include incidental liability coverage "not related to a specifically insured motor vehicle." Plainly, Erie's PCL policy, as an excess policy, is exempt without reference to the second type of policies with incidental liability coverage.

A variation of this argument advanced by plaintiffs is that the PCL Policy 13 excludes coverage for the Klurfelds, members of their household, and their relatives. Plaintiffs argue that since § 38.2-2206(A) mandated UM/UIM coverage in favor of those as to whom Erie sought to exclude coverage, that the Omnibus Clause, § 38.2-2204 vitiated that exclusion nullifying the mandated UM/UIM coverage. However, since the premise of this argument, that § 38.2-2206 mandated such UM/UIM coverage, was false, on account of the express exemption of § 38.2-2206(J), this argument fails.

For the reasons discussed, I conclude that the Erie PCL Policy did not afford UM/UIM coverage for the Klurfelds or their passengers in their Saab 900S involved in the accident.

C. *Whether or Not Benavidez's GEICO Family Auto Liability Afforded Liability Coverage for Benavidez's Operation of the Truck on the Date of the Accident*

*Overview*

The Plaintiffs and GEICO contend that Benavidez's personal GEICO auto liability policy (Family Combination Auto Policy 0Z703840) did not afford coverage for his operation of his employer's truck on the date of the accident. Plaintiffs argue Benavidez was an uninsured motorist unless he was otherwise insured for his operation of the Owen & Sparrow truck.

Erie Insurance Company and USAA contend that Benavidez was an underinsured rather than an uninsured motorist, because his GEICO liability insurance policy afforded him auto liability coverage when driving the Owen & Sparrow truck.

The GEICO auto liability policy issued to Benavidez covers his operation of (1) vehicles owned by him; and (2) "non-owned" vehicles as defined by his GEICO policy. Since Benavidez did not own the truck involved in the accident, Benavidez's coverage under the GEICO policy depends on

whether or not the truck constituted a "non-owned" vehicle as defined by the policy. Both Erie and USAA argue that the truck was such a covered "non-owned" truck. GEICO takes a contrary position. If the truck is determined to be such a potentially covered "non-owned" vehicle, GEICO alternatively argues that Benavidez's operation of the truck fell within a policy exclusion barring its coverage. Erie argues that coverage is not barred by that exclusion.

### Was the Truck a "Non-Owned" Vehicle?

#### 1. The Policy Definition of a "Non-Owned" Vehicle

The GEICO Policy, A-5(11-86) page 4 of 14, defines a "non-owned" vehicle as follows:

> "*non-owned automobile*" means an automobile or trailer *not* owned by or furnished for the regular use of either the named insured or any relative, other than a temporary substitute automobile.

#### 2. Undisputed Facts Regarding Benavidez's Use of the Truck on the Date of the Accident

In his deposition, Benavidez testified he drove trucks for Owen & Sparrow and that he had been hired as a truck driver for the company in 1999. On the date of the accident, he had been dispatched to drive the truck involved in the subject accident and pick up a container on Old Dominion Drive in Arlington County, Virginia. He was driving to that destination in the course of his duties when the accident occurred.

### Analysis and Decision of the "Non-Owned" Vehicle Issue

The purpose of the "non-owned" vehicle definition in the GEICO policy is to protect an insured against liability arising not only from the use of his own automobile but also from liability arising out of his infrequent or casual use of an automobile not covered by the policy. *Quesenberry v. Nichols*, 208 Va. 667, 669, 159 S.E.2d 636 (1968). The essence of an insurance policy is to afford coverage for defined risks accepted by an insurance company, which risks are the foundation for the premiums charged an insured under the policy. *See, State Farm Mut. Auto. Ins. Co. v. Jones*, 238 Va. 467, 469, 383 S.E.2d 734 (1989). But, an insurance policy will not afford

coverage for risks not insured. *See, Pilot Life v. Crosswhite*, 206 Va. 558, 561, 145 S.E.2d 143 (1965).

The linchpin of GEICO's argument against coverage is that while its policy covered Benavidez's operation of non-owned vehicles, by the policy's express terms, it only covered the operation of non-owned vehicles not furnished to Benavidez for his regular use. GEICO thus contends that its policy did not cover Benavidez's operation of a truck assigned to him to perform his duties as an Owen & Sparrow truck driver. The plain meaning of the "non-owned" automobile would seem to dictate against coverage, except for one example: there is no evidence that Benavidez had ever driven the actual truck involved in the accident. Accordingly, the question becomes whether or not Owen & Sparrow's truck is a covered non-owned vehicle, since Benavidez may never have been furnished and may never have driven the specific truck involved in the accident.

After reviewing the authorities presented by the parties, two Virginia Supreme Court decisions appear pertinent to whether or not the truck was a non-owned vehicle as defined by the policy. *Jones, supra; State Farm Mut. Auto. Ins. v. Smith*, 206 Va. 280, 142 S.E.2d 562 (1965).

In *Smith*, a California resident visiting her sick sister in Virginia and using her sister's automobile as a "permissive user," was involved in an accident; she had used her sister's car no more than ten times in an eight week period; she had also primarily used her sister's automobile for her sister's, not her own, purposes; and she only drove the automobile with her sister's permission. Finding that the insured's use of the car did not constitute regular use, the Virginia Supreme Court found in favor of coverage. Later, in *Jones*, Justice Lacy subsequently characterized the Court's holding in *Smith* as being: "that such sporadic, controlled use could not qualify as regular use under any circumstances." 238 Va. at 467.

In *Jones*, an employee of a company drove a van assigned to him for his own purposes; and he exercised continued dominion and control of the vehicle, driving it six days a week for over 70 hours and 300 miles each week. Justice Lacy distinguished the facts before the Court as being materially different than those in *Smith*. She held that the insured's use of his employer's van for business purposes constituted regular use, and she emphasized that the van had been assigned to Jones precisely so he might use it regularly.

Here, GEICO's premiums were predicated on Benavidez's use of his own vehicle and his use of vehicles that he did not own and infrequently used. See, *Quesenberry, supra*. For purposes of this provision, there is no material distinction between a driver exercising regular and continued dominion and control over one of his employer's vehicles from that driver's continued and

regular dominion and control over different vehicles of his employer's fleet of vehicles. In either case, the regular use of the employer's fleet of vehicles dramatically would increase the risk to the insurer. I therefore conclude that the policy, while it does not literally address the precise circumstances before this Court, nevertheless was intended by the parties to exclude the risks associated with Benavidez's regular operation of vehicles comprising an employer's fleet if those vehicles are of a type customarily assigned to him. To reach the opposite conclusion, one must ignore the well-recognized purpose of such policy language, which purpose has been recognized by both the Virginia Supreme Court and other appellate courts. Such a conclusion would be an absurd one. It must therefore be, and is, rejected. See, *Transit Casualty Co. v. Hartman's, Inc.*, 218 Va. 703, 708, 239 S.E.2d 894 (1978).

Accordingly, I find that the GEICO policy did not cover Benavidez's regular use of Owen & Sparrow trucks driven in the course of his employment, even though he had not necessarily theretofore driven his employer's truck involved in the accident. Although not specifically stipulated, the implication of the facts before me was that the truck involved in the accident was of a type usually assigned to Benavidez.

*Did the GEICO Policy Exclude Coverage*
*of Benavidez's Use of His Employer's Truck?*

1. *The GEICO Policy h(2) Exclusion*

The GEICO policy includes the following exclusion:

Exclusions: this policy does not apply under part [Liability]. . . .
(h) to a non-owned automobile while maintained or used by any person while such person is employed or otherwise engaged in. . . .

(2) any other business or occupation of the insured, but this exclusion (h)(2) does not apply to [certain inapplicable activities including the operation of privately owned vehicles for use by chauffeurs or servants].

2. *Analysis and Decision of the h(2) Exclusion Issue*

As the Virginia Supreme Court stated in *Quesenberry v. Nichols*, 208 Va. 667, 159 S.E.2d 636 (1968):

> Any policy of insurance is a contract, and, in the absence of constitutional or statutory barriers, the parties thereto are at liberty to make their own agreement. It needs no citation of authority to assert that where there is an ambiguity in the terms of an insurance policy, they should be liberally construed in favor of the insured and against the drafter of the policy; but this does not mean that a strained or unjustified construction of the policy is to be adopted, which disregards the plain meaning and intent of the parties.

208 Va. at 672, quoting with approval *Aviation Employees Ins. Co. v. Barclay*, 237 Md. 318, 323, 206 A.2d 119, 121 (1965). In accord *Pilot Life Ins. Co. v. Crosswhite*, 206 Va. 558, 561, 145 S.E.2d 143 (1965). Thus, the decision issue is whether Benavidez's operation of the truck was precluded by the h(2) exclusion.

Literally read, the meaning of exclusion h(2) is that the GEICO policy will not provide insurance for operation of a non-owned vehicle while that vehicle is operated for "any person's" occupational or business use, irrespective of whether that operation was infrequent and casual or regular. Erie, however, first maintains that this exclusion only applies to Benavidez's occupational or business use of the truck. Erie therefore argues that while Benavidez drove the truck for his employer's business purposes on the date of the accident, he did not drive the truck for his own business or occupational purposes. This argument is flawed. Benavidez may not have had a business, but he certainly had (since 1999) the occupation of truck driver. Accordingly, he operated the Owen & Sparrow truck on the date of the accident for his occupational purposes. His operation of the truck fell within the purpose and application of the h(2) exclusion and was not covered by the GEICO policy.

Erie also maintains that the plain language of the h(2) exclusion does not negate coverage because the Policy terms require the policy to mean that only driving by one other than the policy holder, Benavidez, would negate coverage. Erie thus contends that while the h(2) exclusion excludes coverage for operation of a vehicle by "any person" in connection with Benavidez's occupation, "any person" cannot reasonably be interpreted to include Benavidez's own operation of a vehicle for purpose of his occupation. I reject that argument as well. The plain meaning of "any person" as used in the h(2) exclusion clause comprehends all people and, therefore, Benavidez. Thus, the plain meaning of exclusion h(2) is that coverage is excluded, and the policy does not cover the operation of a non-owned vehicle by anyone engaged in Benavidez's occupation, including Benavidez himself. While this language is

broad enough to provide that driving by others for Benavidez's business or occupational purposes would vitiate coverage, it specifically provides that Benavidez's own operation of a vehicle in the course of his occupation would vitiate such coverage.

While one can readily conceive how another might drive a vehicle for the purposes of Benavidez's business, especially if Benavidez operated, for example, a florist or message delivery service, it is difficult to imagine a situation where another would drive vehicles for the purposes of Benavidez's occupation.

Erie further argues, however, that the meaning of the policy term, "any person," must be gleaned not merely by the specific words used in the exclusion h(2) but with reference to the entire policy. Erie thus argues that viewed in this way, "any person" means anyone other than the named insured, Benavidez. A review of the policy does not support this contention. For example, UM coverage is defined as coverage of "any person" to include the named insured or a permissive user. *See*, GEICO Policy, A-5(11-86), page 9 of 14.[14] Moreover, "any person" is used throughout the policy with the additional words "other than the named insured" or "including the named insured." This intermixing of terms using the words "any person" first undermines the dichotomy between the named insured and any person meaning anyone other than the insured urged by Erie. Furthermore, when the term "any person other than the named insured" is used in the policy, it is plainly intended to expressly preclude the named insured, while other words such as "any person" or "any person including the named insured" comprehends the insured and all other persons. The definitional argument advanced by Erie simply is belied by the variety of terms used in the policy. Nor does it logically otherwise make sense.

In these circumstances, the plain meaning of the words used in exclusion h(2) must be given effect. The words "any person" plainly refer to Benavidez. Implicit in my decision is my conclusion that the h(2) exclusion is not ambiguous as also argued by Erie.

Because, at the time of the accident, Benavidez was (1) driving a non-owned vehicle furnished for his regular use, and (2) because he was driving a vehicle used while he was employed or otherwise engaged in his business or occupation, I conclude the GEICO policy did not afford Benavidez liability coverage for the accident that is the subject of this case.

---

[14] A copy of this document is not contained in the original joint document exhibit, but a stipulated authentic copy was later provided to the Court.

D. *Did the Landmark Insurance Policy Cover Benavidez's Operation of the Truck?*

*Overview*

Erie, GEICO, and USAA each contend that the Landmark Commercial Auto Policy BA2030797 issued to American Equipment Leasing effective May 1999, Joint Exhibit 20, afforded liability coverage for operation of the truck by Owen & Sparrow, American Equipment Leasing's assignee of the truck Master Lease. Both American Equipment Leasing's acquisition of the truck and the assignment of the Master Lease to Owen & Sparrow post-dated the commencement date of the Landmark Policy. American Equipment Leasing acquired the truck in June 1999 and thereafter approved the assignment of the lease to Owen & Sparrow in October 1999. Landmark argues that the truck was not covered by its policy both because it was not owned when the policy was issued and because of other provisions in the policy precluding coverage. Landmark alternatively contends that, if the truck was covered by the Landmark policy terms, its coverage is limited to Virginia's minimum financial responsibility requirements.

*The Landmark Policy*

The Landmark Commercial Policy is comprised of the endorsements listed on endorsement AU 3590(7-95). Section II of one of those endorsements, the Business Auto Coverage Form, entitled "Liability Coverage," states in pertinent part:

A. *Coverage*
We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance, or use of a covered "auto". . . .

B. *Who is Insured*
The following are "insureds":
a. You for any covered "auto."
b. Anyone else while using with your permission a covered "auto" you own, hire, or borrow, [except inapplicable exceptions].

Section I of the Business Auto Coverage Form, entitled "Covered Autos," states Item Two of *the Declarations* designates the covered "autos." It proceeds to enumerate nine symbols that designate the different coverages. Symbols 1, 2, 3, 4, 5, and 6 either impliedly or expressly provide coverages of vehicles "you acquire ownership of after the policy begins."

The Declarations, however, do not contain any of the coverage symbols listed in Section I of the Business Auto Form, but instead contain the coverage symbol 10. Symbol 10 is only explained by reference to yet another policy endorsement, AU 3502(A), entitled "Leasing (12 Months or Longer) Concerns Contingent Coverage" (hereinafter AU 3502).[15]

Section A of AU 3502 in turn defines a "Leased Auto" as a "vehicle you lease to a lessee under a leasing agreement of one year or more for which the leasing agreement required that lessee provide primary insurance for you." However, it does not otherwise indicate whether a vehicle acquired after the Policy's commencement date was covered by the Policy.

AU 3502 also provides:

B. *Liability Insurance* and any required no fault insurance provided by this policy for a covered auto which is a leased auto applies subject to the following provisions:

1.a. The lessee has furnished you with a certificate of insurance *required by the leasing agreement;* and *such certificate provides advance cancellation notification* to you; and *you are named as an additional insured under the lessee's policy.*

b. At the time of an accident, *the insurance is not collectible.*

2. For you, the limit of our liability for the insurance provided by this endorsement is: $3,000,000.

3. The insurance provided by this endorsement is excess over any other collectible insurance, whether primary, excess, or contingent.

4. If we are required by law to provide liability insurance on behalf of any person or organization other than you, our obligation to pay damages on behalf of such person or organization shall not exceed the applicable limit required by the Financial Responsibility Law of the State in which the

---

[15] The Declarations, however, also refer to AU 3502 under portions of the form labeled "Schedule of Covered Autos" and "Classification."

Bodily Injury or Property Damage accident takes place. If no other insurance (whether primary, excess, or contingent) is available to such person or organization, then this policy applies but only up to the compulsory or financial responsibility law limits, or if such person or organization has other available insurance (whether primary, excess, or contingent) less than the compulsory or financial responsibility law limits, such person or organization is an insured only for the amount by which the compulsory or financial responsibility law limits exceed the limits of their other insurance.

Paragraph, C, subparagraph 1, of AU 3502 requires American Equipment Leasing to maintain "a complete record of all leased vehicles subject to this insurance" which would be available to Landmark for examination. Paragraph C, subparagraph 2, states: "The premium for this insurance is based upon the actual number of [vehicles] owned and held for lease to others for a term of one year or more during the policy period." It goes on to provide that the premium would be adjusted as indicated in paragraph D.

Paragraph D of AU 3502, entitled "Vehicles Covered," lists five types of vehicles, including "heavy commercial." It furthermore requires American Equipment Leasing to report on a semi-annual basis, the total number of vehicles in certain specific categories which were leased by American Equipment Leasing for the "the period." Various categories and number of vehicles are listed.

### The Master Lease

American Equipment Leasing's purchase of the truck from Vision Financial Group became effective in June 1999, a month after the effective date of the Landmark Policy. In October 1999, American Equipment Leasing leased the truck to East Coast Development Corporation, which in turn, in the same month, assigned the lease to Owens & Sparrow, with American Equipment Leasing's consent.

Paragraph 1.5 of The Master Lease "Insurance" provides:

(a) Coverage. Lessee will insure for the following risks with insurances or recognized responsibility. . . .

(ii) Comprehensive public liability insurance with respect
to the condition, possession, maintenance, operation, and use of
the Equipment in an amount not less than $2 million.

*See,* Joint Exhibit 17, Section I. The "Equipment Description" states: 1999 Mack Roll Off Truck, VIN: 1M2F267CXXMo44274, as better described on the corresponding acceptance certificate(s), having an Estimated Lessor's Cost of $111,050.00.

### The United Pacific Policy

Owens & Sparrow obtained liability insurance for the truck from the United Pacific Insurance Company. However, Owens & Sparrow never designated American Equipment Leasing as an additional insured party on that policy. *See,* Joint Exhibits 15, 16.

### Analysis and Decision:
### the Coverage Afforded by the Landmark Policy

Preliminarily Landmark argues that the truck did not fall within the definition of a "leased auto" set forth in AU 3502:

[A] Leased Auto [is] a [vehicle] you lease to a lessee under a leasing agreement of one year or more for which the leasing agreement required that lessee provide primary insurance for you.

The thrust of Landmark's argument is that the truck does not qualify as "a leased auto" because Owens & Sparrow had not added American Equipment Leasing as an additional insured on its United Pacific Policy. However, this defense is unavailing to Landmark. Its own policy language merely defines "a leased auto" as one leased pursuant to a lease agreement that required the lessee to provide primary insurance in favor of the owner. Since the Master Lease did require Owens & Sparrow to provide such insurance, irrespective of whether Owens & Sparrow actually provided that insurance, the truck qualified as "a leased auto." It, therefore, met the definition of a "leased auto."

Landmark argues on brief that the Landmark coverage only applied if certain conditions contained in Paragraph B of AU 3502 were met. Thus, Landmark argued that Paragraph B.1.a required Owen & Sparrow to furnish a

certificate of insurance providing advance notice to American Equipment Leasing of cancellation of the liability policy (required by the Master Lease) and showing that American Equipment Leasing was an additional insured under that policy. Erie argues that American Equipment Leasing's failure to satisfy this provision merely meant that Landmark enjoyed the right to cancel the policy. Erie refers this Court to yet another Landmark Policy endorsement, IL 0246 0996. However, a review of endorsement IL 0246 0996 discloses that the endorsement pertains to the cancellation of the entire American Equipment Leasing policy, not coverage of particular vehicles insured under the policy. Since Owens & Sparrow did not provide American Equipment Leasing with the certificate of insurance required by Paragraph B.1.a of the policy and could not have done so since American Equipment Leasing was never made an additional insured as required, the Owen & Sparrow truck was not, by reason of Paragraph B.1, covered by the Landmark Policy.

Landmark further argues that the truck was not covered by the Landmark Policy because American Equipment Leasing's acquisition of it post-dated the Landmark Policy. In support of this argument, Landmark argues that, since certain Landmark coverage symbols contained in the Business Auto Coverage Form expressly designate coverage of after-acquired vehicles, had after acquired coverage been intended, the coverage symbol in the Declarations would have denoted one of those Business Auto Coverage Form symbols. Landmark argues instead the coverage provided was denoted by the symbol 10, another endorsement defining coverage "10," CA 99 54 12 90, which endorsement does not indicate that coverage "10" applies to after acquired vehicles.

Endorsement CA 99 54 12 90, defining coverage symbol 10, merely refers to AU 3502. The logical inference is that one must refer to AU 3502 to determine conditions relating to coverage of trucks leased for twelve months or more. AU 3502, however, does not expressly indicate whether or not after-acquired vehicles are covered by the Policy. It does suggest that Landmark did not require American Equipment Leasing to identify to Landmark any vehicles that were covered by the policy but merely required its insured to semi-annually denominate — for premium calculation purposes — *the number* of vehicles that were covered, thereby implying that the number of vehicles covered might vary.[16] Since the number of covered vehicles could increase or

---

[16] Paragraph C.1 required American Equipment Leasing to maintain records "of all leased [vehicles] subject to this insurance together with lease agreements and Certificates of Insurance furnished to you." However, this does not obviate coverage. And while counsel tendered to this Court "Exhibit C" as a list of

decrease during the policy's life, it is inferable that after acquired trucks would be covered. Such an ambiguity must be resolved in favor of coverage. *Hunt v. Erie Ins. Group*, 238 Va. 74, 78, 380 S.E.2d 631 (1989); *Andrews v. American Health & Life Ins. Co.*, 236 Va. 221, 224, 372 S.E.2d 399 (1988). Landmark's argument, therefore, is unpersuasive.

Landmark next argues that coverage fails because Form AU 3502, Paragraph B.1.b, requires as a condition of coverage that the lessee's underlying insurance not be collectible "at the time of the accident." Landmark argues that Owen & Sparrow's United Pacific Policy must be deemed collectible because the United Pacific Insurance Company, and its parent, Reliance Insurance Company, had not yet been placed in receivership. However, proof of collectibility negating coverage at least requires an involved analysis of the United Pacific finances on the date of the accident. Since Landmark assumes an unproven state of United Pacific's financial affairs, its defense based on the collectibility of the United Pacific Policy must be rejected.

Finally, Landmark argues that, should this Court find that its Policy affords coverage for the accident, Landmark's liability coverage is limited to the minimum financial responsibility limits set by Va. Code § 46.2-472. This issue is framed by Paragraph B.4, which provides, if Landmark is required to provide coverage for a party other than American Equipment Leasing, such coverage is the excess between Virginia's minimum financial limits and such lesser liability insurance covering the other party or, if no coverage exists, the Virginia minimum financial limits. Plainly, Landmark's position in this regard appears well founded, since Benavidez is not a named insured, that is, he is a party other than American Equipment Leasing. Erie argues that Landmark's liability would be controlled by 49 U.S.C. § 31139, 49 C.F.R. 387.301, which requires certain freight vehicles to provide insurance of at least $750,000. This argument fails because the facts stipulated do not show that the truck involved is covered by the federal statute for a multiplicity of reasons, including but not limited to the weight of the truck itself.

---

Customers, the number and types of vehicles leased by those customers, ostensibly obtained from American Equipment Leasing, as Erie's counsel persuasively orally argued, this list is incomplete on its face as it does not purport to contain all the classes of vehicles listed in Paragraph D entitled "Vehicles Insured."

### III. *Conclusion*

For the reasons set forth in this opinion, my decision as to the questions before me may be summarized as follows:

First, that Va. Code § 38.2-2206(A) mandates both UM and UIM coverages in all Virginia auto liability policies. However, an insurer's total UM and UIM combined liability under such policies is limited to the face amount of the insurer's liability policy;

Second, the Erie PCL policy owned by the Klurfelds is an excess policy and does not afford them UM/UIM coverage;

Third, Benavidez's GEICO family auto liability policy did not cover Benavidez's regular use of Owen & Sparrow vehicles driven in the course of his employment, even though he had not necessarily previously driven his employer's truck involved in the accident;

Fourth, the Landmark Policy excluded coverage of the truck driven by Benavidez because Owen & Sparrow did not satisfy a condition of coverage, the delivery to American Equipment Leasing of a United Pacific certificate of insurance naming American Equipment Leasing as an additional insured of the truck.

February 20, 2003

BY JUDGE JANE MARUM ROUSH

This matter came on to be heard on November 14, 2002, on the following matters:

1. Plaintiffs' Motion for Declaratory Judgment; and

2. Defendant Virginia Property and Casualty Insurance Guaranty Association's Counterclaim for Declaratory Relief.

At that time, the Court took the matters under advisement. The Court has now fully reviewed the pleadings and considered the arguments of counsel. For the following reasons, the Plaintiffs' Motion for Declaratory Judgment will be granted in part and denied in part, and the Defendant Virginia Property and Casualty Insurance Guaranty Association's Counterclaim for Declaratory Relief will be granted in part and denied in part.

*Facts*

This case arises out of a fatal motor vehicle accident that occurred on March 18, 2000, in Fairfax County where Interstate 95 intersects with the Capitol Beltway. This area is commonly known as the "Mixing Bowl."

A dump truck leased to Owen & Sparrow, Inc., and OSA Waste, L.L.C., was travelling north on Interstate 95 when it was struck on the left side by a Nissan Xterra owned by Sandra Reardon and driven by James Richardson. As a result of the collision, Edgardo Benavidez, the driver of the dump truck, lost control of the truck. The dump truck veered across three lanes of traffic, catapulted over two guardrails, and landed on top of two southbound automobiles, crushing both.

One of the southbound automobiles was owned and operated by Scott Klurfeld. He and his front seat passenger, his wife Janis Klurfeld, were killed. Two rear seat passengers, the Klurfelds' son Zachary Klurfeld and a family friend George MacDougall, both minors, survived but were seriously injured.

All three occupants of the second southbound automobile that was crushed by the dump truck were killed. They were Russell Surratt, his wife Inna Surratt, and Jacqueline Ernst.

At the time of the accident, Benavidez, Owen & Sparrow, Inc., and OSA Waste, L.L.C., were insured for commercial auto liability by a primary policy issued by United Pacific Insurance Company. United Pacific Insurance Company was a part of or a subsidiary of Reliance Insurance Company. The United Pacific policy had liability limits of $1,000,000 per accident.

Benavidez, Owen & Sparrow, Inc., and OSA Waste, L.L.C., had an additional excess umbrella policy issued by Reliance Insurance Company. The Reliance policy had aggregate limits of $2,000,000.

United Pacific Insurance Company and Reliance Insurance Company were both authorized to conduct business in Virginia. On October 3, 2001, Reliance Insurance (including United Pacific Insurance Company) was declared to be insolvent by the Commonwealth Court of Pennsylvania.

Sandra Reardon, the owner of the Xterra, was insured by State Farm Insurance. At the time of the accident, the coverage amounts were $50,000 per person and $100,000 per accident. James Richardson, the driver of the Xterra, was also covered by State Farm. At the time of the accident, his coverage amounts were $25,000 per person and $50,000 per accident. State Farm has tendered the policy limits of $150,000.

The parties stipulate that the liability policy limits for the claims arising from the accident are inadequate to satisfy the claims and that James Richardson is underinsured for the claims against him.

In addition to liability insurance covering the potential tortfeasors, the victims of the accident had various insurance policies that may cover some of the losses incurred.

The Klurfeld automobile was insured by an Erie Auto Policy, which provided uninsured/underinsured motorist coverage for bodily injury in the amount of $300,000 per person and $300,000 per accident. Scott and Janis Klurfeld were also named insureds under an Erie Personal Catastrophe Policy with a limit of $1,000,000.

Russell Surratt's vehicle was insured by USAA. He had an uninsured/underinsured policy through USAA that covered the accident vehicle with limits of $25,000 per person and $50,000 per accident.

Inna Surratt had an uninsured/underinsured policy through Erie with policy limits of $100,000 per person and $300,000 per accident.

Jacqueline Ernst had three policies through GEICO with aggregate limits of $900,000 for uninsured coverage and $900,000 for underinsured coverage. Ms. Ernst, as a passenger in the Surratt automobile, is potentially entitled to uninsured and underinsured coverage under the USAA policy covering the Surratt vehicle.

George MacDougall, as a passenger in the Klurfeld vehicle, is potentially entitled to uninsured and underinsured coverage under the Erie policy covering the Klurfeld vehicle.

Zachary Klurfeld received $15,000 in medical payments coverage under the Erie policy covering his parents' vehicle. In addition, some of Zachary Klurfeld's medical expenses have been covered under his family's health insurance policy.

The Estates of Scott and Janis Klurfeld each received $10,561.25 in medical expense payments under the "medpay" provisions of the Erie policy covering the Klurfeld automobile.

George MacDougall received some medical expense payments from Erie pursuant to "medpay" provisions of the policy covering the Klurfeld vehicle. At the time of the accident, George MacDougall was insured under his family's health insurance policy. That policy has paid some of his medical expenses.

The Estate of Russell Surratt has received some medical expense payments under the medical payments coverage of his USAA policy and Inna Surratt's Erie policy. In addition, the Estate of Russell Surratt received $15,000 in seat belt coverage under his USAA policy.

The Estate of Inna Surratt has received some medical expense payments under the medical payments coverage of her Erie policy and Russell

Surratt's USAA policy. In addition, the Estate of Inna Surratt received $15,000 in seat belt coverage under her husband's USAA policy.

The Estate of Jacqueline Ernst received $1,000 in medical payments and $15,000 in seat belt coverage from Russell Surratt's USAA policy.

*Virginia Property and Casualty*
*Insurance Guaranty Association*

Pursuant to Virginia Code Ann. § 38.2-1600, et seq. (the "Act"), the Virginia Property and Casualty Insurance Guaranty Association (the "Guaranty Association") was established to "provide prompt payment of covered claims to reduce financial loss to claimants or policyholders resulting from the insolvency of an insurer." The Guaranty Association is obligated to pay "covered claims" in an amount "not exceeding $300,000 per claimant" for each policy issued by an insolvent insurer. Va. Code § 38.2-1606(A)(1)(a)(ii).

The term "covered claim" is defined to mean "an unpaid claim . . . submitted by a claimant which arises out of and is within the coverage . . . issued by an insurer who has been declared to be an insolvent insurer." Va. Code § 38.2-1603.

The Act contains an exhaustion of remedies provision. Va. Code § 38.2-1610(A) provides:

> Any person having a claim against an insurer under any provision in an insurance policy, other than a policy of an insolvent insurer under which the claim is also covered, shall be required to first seek recovery under the policy covered by the insurer which is not insolvent. Any amount payable on a covered claim under this chapter shall be reduced by the amount of any recovery under the insurance policy.

Va. Code § 38.2-1610(A).

*Plaintiffs' Motion for Declaratory Relief*

Plaintiffs[17] seek declaratory relief against the Guaranty Association, which is one of the defendants[18] in this case. Specifically, the plaintiffs seek a declaratory judgment that:

---

[17] Plaintiffs are Gordon and Carolyn MacDougall, in their individual capacities and as next friends of George MacDougall; Larry Klurfeld, as personal

1. The Guaranty Association may not set off any amounts paid by health insurers for injuries to George MacDougall or Zachary Klurfeld because their medical bills were incurred when they were minors and they do not have any claim for recovery against any health insurers;

2. The Guaranty Association has no right to set off any amounts paid by health insurance to anyone because Va. Code § 38.2-1600 specifically excludes health insurers from its scope. By its terms, this Code provision is limited to liability policy insurers of the same or similar type to the insolvent insurer. Because health insurance is entirely different from liability insurance, no credit is available;

3. The Guaranty Association's guarantee for each covered claim is capped at $300,000 per insolvent insurance policy, although each covered claim may greatly exceed this cap;

4. Any credit taken by the Guaranty Association for other insurance must be taken from the entire "covered claim" not from the limited amount of the claim guaranteed by the Guaranty Association.

See Fourth Amended Motion for Judgment, at pp. 77-79.

*The Guaranty Association's Counterclaim for Declaratory Relief*

In its counterclaim, the Guaranty Association seeks a declaratory judgment that:

1. Any payments made to plaintiffs by solvent insurers for parties against whom plaintiffs have asserted liability for the claim in question reduce

---

representative for Scott Klurfeld and Janis Klurfeld and as next friend of Zachary Klurfeld; Mollie Harriman Klurfeld; Adam Harriman Doyle; Christopher Marc Doyle; Andrew and Joanne Surratt, personal representatives for Russell Surratt; Edward and Sophia Gorin, personal representatives for Inna Surratt; Michael J. Ernst, in his individual capacity and as personal representative for Jacqueline Ernst; Cheryl Weiss Barger; Carla Weiss Cruse; Carl Jeff Weiss; and Karen Weiss.

[18] Defendants are The Hartford Insurance Group; The Hartford; Hartford Casualty Insurance Company; Hartford Fire Insurance Company; Judith A. Myers; Associated Insurance Management, Inc.; USAA Casualty Insurance Company; Owen & Sparrow, L.L.C.; Government Employees Insurance Company, a/k/a GEICO; Erie Insurance Company, a/k/a Erie Insurance Group, a/k/a Erie Property & Casualty Company; State Farm Insurance Company; Fireman's Fund Insurance Company, d/b/a Landmark American Insurance Company; Virginia Property and Casualty Insurance Guaranty Association; James Richardson; and Edgardo Benavidez. For the purposes of this declaratory judgment action, all defendants have stipulated liability. See Stipulation of Liability filed December 31, 2002.

dollar for dollar any amount payable by the Guaranty Association on covered claims asserted by the plaintiffs;

2. Any payments made to the plaintiffs by insurers providing uninsured or underinsured motorist coverage for the claim reduce dollar for dollar any amount payable by the Guaranty Association on covered claims asserted by such plaintiffs;

3. Any payments made to the plaintiffs by insurers providing health insurance coverage or benefits for treatment of injuries sustained in the accident reduce dollar for dollar any obligation the Guaranty Association has to pay covered claims asserted by such plaintiffs;

4. Any amount payable by the Guaranty Association for the wrongful death of Scott Klurfeld, Janis Klurfeld, Russell Surratt, Inna Surratt and Jacqueline Ernst cannot exceed $300,000 for each of the estates of such individuals per Reliance policy. The statutory beneficiaries of the decedents do not each have a separate covered claim;

5. The offsets to which the Guaranty Association is entitled are taken from the amount payable on a covered claim (i.e., the lesser of $300,000 or policy limits) and not from the verdict which a covered claimant may obtain against the insured of the insolvent insurer;

6. Any person having a claim against an insurer under any provision in an insurance policy, other than a policy of Reliance, is required to first seek recovery under the policy covered by the insurer which is not insolvent;

7. Medical expenses which a guardian, next friend, administrator, or personal representative paid on behalf of an injured or deceased individual are part of the covered claim of the individual on whose behalf the expenses were paid and the person who paid such expenses does not have a separate claim to recover for the payment of such expenses.

See Guaranty Association's Counterclaim, at pp. 16-17.

*Issues*

I. *Whether the Minor Claimants Have Separate Claims Against the Guaranty Association for the Minors' Physical Injuries and for Medical Expenses*

The plaintiffs contend that the personal injuries to each of the minor claimants, Zachary Klurfeld and George MacDougall, gave rise to two separate claims against the Guaranty Association: one on behalf of the child for his personal injuries and the second on behalf of the parents or guardians for the child's past and future medical expenses. In other words, the plaintiffs

claim that two covered claims arose out of the injuries to Zachary Klurfeld and two covered claims arose out of the injuries to George MacDougall.

The Guaranty Association concedes that Virginia law allows parents or guardians a right to recover from tortfeasors for medical expenses incurred to treat their minor children. The Guaranty Association contends, however, that such a right does not give the parents or guardian a separate claim under the Act. According to the Guaranty Association, the "derivative nature of the parent's claim makes it apparent that a parent's claim for medical expenses must be viewed as the part of the minor's claim that it is. As such, it must be satisfied from the covered claim of the child."

The Court agrees with the plaintiffs that two covered claims arose from the injuries to each of the minor plaintiffs. Virginia law is well-established that:

> Two causes of action ordinarily arise as the result of an injury by wrongful act to an unemancipated minor: one cause of action on behalf of the minor to recover damages for the injury . . . and the other on behalf of the parent for loss of services during minority and necessary expenses incurred for the minor's treatment.

*Virginia Farm Bureau Mut. Ins. v. Frazier*, 247 Va. 172, 174, 440 S.E.2d 898, 899, n. 1 (1994), *citing Moses v. Akers*, 203 Va. 130, 132, 122 S.E.2d 864, 865-66 (1961). Accordingly, the Court will grant declaratory relief in favor of the plaintiffs on this issue.

II. *Whether the Statutory Cap of $300,000 Applies to Each Wrongful Death Claim or Each Statutory Beneficiary Under a Wrongful Death Claim*

The Guaranty Association asked for a declaration that only the personal representatives of the estates of the decedents may make a claim against the Guaranty Association. The Guaranty Association anticipated that the statutory beneficiaries of the Klurfelds, the Surratts, and Ms. Ernst might make separate claims against the Guaranty Association.

The plaintiffs concede that only the personal representatives of the estates make a single claim against the Guaranty Association for each death resulting from the accident. See Va. Code § 8.01-50 (actions for wrongful death to be brought in the name of the personal representative).

III. *Whether the Liability of the Guaranty Association is Reduced by Recoveries from "Medpay" or "Seat Belt" Coverage*

The plaintiffs contend that the Guaranty Association's liability to each claimant need not be offset by any amounts the claimant receives as a result of "medpay" or "seat belt" coverage under a policy of insurance from a solvent insurer.

Zachary Klurfeld, George MacDougall, and the estates of each of the decedents have received some payments as a result of "medpay" coverage. In addition, the estates of each of the three occupants of the Surratt vehicle have received $15,000 pursuant to the "seat belt" coverage under the USAA policy covering that vehicle. The Surratt vehicle was covered by an insurance policy issued by USAA that provided a death benefit of $15,000 to any occupant of the vehicle who died in an automobile accident while wearing a seat belt.

The Guaranty Association argues that it is entitled to offset any medpay or seat belt benefits received from a solvent insurer.

Both the plaintiffs and the Guaranty Association point to Code § 38.2-1610 in support of their respective positions. That section is the so-called "exhaustion of remedies" provision. It provides, in pertinent part:

Any person having a claim against an insurer under any provision in an insurance policy, other than a policy of an insolvent insurer under which the claim is also covered, shall be required to first seek recovery under the policy covered by the insurer which is not insolvent. Any amount payable on a covered claim under this chapter shall be reduced by the amount of any recovery under the insurance policy.

Va. Code § 38.2-1610(A). A "covered claim" is defined as:

An unpaid claim, including one for unearned premiums, submitted by a claimant, which arises out of and is within the coverage and is subject to the applicable limits of a policy covered by this chapter and issued by an insurer who has been declared to be an insolvent insurer. . . .

Va. Code § 38.2-1603.

According to the plaintiffs, the Act provides that a "covered claim" is only reduced by payments received from insurers on a claim that "arises out of and is within the coverage" of a policy issued by an insolvent insurer. Thus the

plaintiffs argue that medpay and seat belt claims, "although occasioned by the same accident, are not the 'covered claim' that arises out of the occurrence and to which the Reliance policies would have applied." In other words, the plaintiffs contend that covered claims can only be offset by recoveries on other covered claims.

Plaintiffs rely upon *Virginia Property & Casualty Ins. Guar. Ass'n v. International Ins. Co.*, 238 Va. 702, 385 S.E.2d 614 (1989). In that case, the Virginia Supreme Court ruled that the "exhaustion of remedies" provision required the claimant against the Guaranty Association to recover from his uninsured motorist policy and suffer the setoff. In reaching that decision, the Court held that the "exhaustion requirement applies in instances where the claim: (1) meets the definition of a 'covered claim' under the Act; and (2) can validly be asserted against a solvent insurer." 238 Va. at 706.

The Guaranty Association argues that the plaintiffs' reliance on *Virginia Property & Casualty Ins. Guar. Ass'n v. International Ins. Co.*, is misplaced, in that the case was decided under the Act before it was rewritten by the General Assembly in 1986. Specifically, former Code § 38.1-767(1), the predecessor to present § 38.2-1610(A), the exhaustion of remedies provision, read as follows:

> Any person having a claim against an insurer under any provision in an insurance policy other than a policy of an insolvent insurer *which is also a covered claim*, shall be required to exhaust first his right under such policy. Any amount payable on a covered claim under this chapter shall be reduced by the amount of any recovery under such insurance policy.

Va. Code § 38.1-767(1) (Repl. Vol. 1981) (repealed) (emphasis added).

Guaranty Association maintains that the 1986 change to the exhaustion of remedies provision is critical to the resolution of the present dispute. The Guaranty Association concedes that the plaintiffs' interpretation of the exhaustion of remedies provision would be correct under the prior statute and that, under that statute, the Guaranty Association would not be entitled to a set-off for medpay, seat belt coverage, or other first party insurance.

In the following passage, additions to the provisions by the 1986 revisions are underlined and deletions are in italics:

> Any person having a claim against an insurer under any provision in an insurance policy, other than a policy of an

insolvent insurer *which is also a covered claim* <u>under which the claim is also covered</u>, shall be required to *exhaust first his right* *first seek recovery* under *such the* policy *covered by the insurer* · *which is not insolvent.* Any amount payable on a covered claim under this chapter shall be reduced by the amount of any recovery under *such the* insurance policy.

Thus, the 1986 revisions to the Act deleted the language "which is also a covered claim" and substituted therefor "under which the claim is also covered." According to the Guaranty Association, the 1986 amendment to the exhaustion of remedies provision specifically deleted any requirement that a claim against a solvent insurer had to be a "covered claim" before it was required to be offset.

The Court agrees with the Guaranty Association that the 1986 revisions to the exhaustion of remedies provision deleted the requirement that only "covered claims" are offset against the Guaranty Association's liability to the claimant. Under the prior statute, the phrase "which is also a covered claim" modified the term "claim." In turn, "claim" referred to a claim "against [a solvent] insurer under any insurance policy." The amount payable on a covered claim was reduced by the recovery on such policy, i.e., a policy issued by a solvent insurer on a covered claim.

As presently enacted, the exhaustion of remedies provision requires the claimant to first seek recovery from a solvent insurer. Any "amount payable [by the Guaranty Association] on a covered claim" is then reduced by the claimant's recovery from a solvent insurer. The statute does not distinguish between claims that are "within the coverage" provided by the insolvent insurer and ancillary claims. In short, there is no longer the restriction that covered claims are offset only by recoveries from solvent insurers on "covered claims."

Therefore, the covered claims payable by the Guaranty Association should be reduced by any amounts that the claimants have received under the "medpay" or "seat belt" provisions of any insurance policy issued by a solvent insurer.

IV. *Whether the Liability of the Guaranty Association is Reduced by Health Insurance Benefits Paid to the Claimants*

The plaintiffs maintain that the exhaustion of remedies provision does not apply to health insurance. The plaintiffs rely on Va. Code § 38.2-1601(1) which provides that the Act does not apply to "health or disability insurance."

Therefore, the plaintiffs contend, the exhaustion of remedies provision of the Act applies only to property or casualty insurance benefits, and not health insurance benefits, payable from the same loss.

According to the Guaranty Association, the plaintiffs read too much into Va. Code § 38.2-1601(1) which provides that the Act does not apply to "health or disability insurance." The Guaranty Association maintains that "all § 38.2-1601(1) does is exclude health insurers from membership in the Virginia Property and Casualty Insurance Guaranty Association. No part of § 38.2-1601 in any way limits the broad reach of the exhaustion of remedies provision found at § 38.2-1610(A)."

The Guaranty Association argues that health insurance benefits are no different from benefits paid pursuant to "medpay" or "seat belt" coverage for the purposes of the Act's exhaustion of remedy provision. Thus the Guaranty Association argues that a claimant must "first seek recovery" from *any* insurance from a solvent insurer. The Guaranty Association states that, under Va. Code § 38.2-1610(A), even life insurance proceeds could be required to be applied as an offset to its liability. Nonetheless, the Guaranty Association is not asking for a declaration that life insurance proceeds must be offset from the covered claims in this case.

The plaintiffs cite *McCarthy v. Bainbridge*, 1999 Pa. Super. 245, 739 A.2d 200 (Pa. Super. 1999), *aff'd*, 565 Pa. 464, 774 A.2d 1246 (2001), in support of their argument that health insurance is not required to be set off from their claims against the Guaranty Association. In that case, the Pennsylvania Superior Court held that Pennsylvania's "non-duplication of recovery" provision did not require the Pennsylvania Guaranty Association to set off life insurance benefits received by the covered claimants. The court reasoned that there must be "some relationship between the claim against [the guaranty association] and the claim under other insurance that must be offset." The court concluded that life insurance need not be offset because it insures "against different risks and protects against different types of loss." 739 A.2d at 203. But see *Price v. Pennsylvania Property & Casualty Ins. Guar. Ass'n*, 2002 Pa. Super. 74, 795 A.2d 407 (Pa. Super. 2002) (medial insurance benefits are a setoff against a medical malpractice claim against insolvent insurer).

The Guaranty Association notes that the holding in *McCarthy* might be based on the language of the statute creating Pennsylvania's Property and Casualty Insurance Guaranty Association. That statute provides that one of that association's purposes is to "*avoid* financial loss to claimants or policyholders as a result of the insolvency of an insurer." 40 P.S. § 991.1801 (emphasis added). Virginia's statute, by contrast, states that a purpose of the

Guaranty Association is to "*reduce* financial loss to claimants or policyholders." Code § 38.2-1600 (emphasis added).[19] The Guaranty Association argues that the Virginia General Assembly recognized that there may be some loss to claimants or policyholders as a result of an insurer's insolvency. According to the Guaranty Association, the Act was intended to provide a base level of coverage from the Guaranty Association after recovery from all solvent insurers, not to eliminate the adverse effects of an insurer's insolvency. See, e.g., *Northland Ins. Co. v. Virginia Property & Casualty Ins. Guar. Ass'n*, 240 Va. 115, 392 S.E.2d 682 (1990) (Guaranty Association is not itself an "insurer" and does not step into the shoes of the insolvent insurer for subrogation purposes).

The Court agrees with the Guaranty Association that health insurance benefits actually paid are an offset from covered claims. In *Bogle Dev. Co. v. Buie*, 250 Va. 431, 463 S.E.2d 467 (1995), the Virginia Supreme Court was confronted with an analogous case. Buie was injured on the job and received workers' compensation benefits from Rockwood Insurance Company. Rockwood became insolvent. Buie received some payments from his health insurer, less a deductible. Buie filed a claim against the Guaranty Association, seeking recovery for the medical bills, deductibles, and co-pays resulting from his workplace injury. The Guaranty Association paid Buie for his out of pocket expenses but refused to reimburse him for medical bills that were paid by his health insurer. The Virginia Supreme Court agreed with the Guaranty Association, holding that "once Buie was reimbursed for his out of pocket expenses no right of the claimant was 'at stake'." 250 Va. at 434. Implicit in the Supreme Court's holding in *Bogle* is that no right of the claimant was "at stake" because Buie had no right to seek compensation from the Guaranty Association for medical bills covered by his health insurance.

*V. Whether Any Offsets Are Applied to the Claim Before or After the Application of the Statutory Cap*

The plaintiffs contended in their Motion for Judgment and in their brief that any setoffs to which the Guaranty Association may be entitled to take from a covered claim are to be applied to the gross amount of the claim and not the statutory cap of $300,000 per insolvent policy. The plaintiffs now agree with the Guaranty Association that any offsets the Guaranty Association

---

[19] Prior to the 1986 revisions to the Act, a stated purpose of the Guaranty Association was to "avoid financial loss." Code § 38.1-757 (Repl. Vol. 1981) (repealed). The 1986 revisions changed "avoid" to "reduce."

may be entitled to take with respect to a covered claim are to be deducted from the lesser of the applicable limits of the insolvent policy or $300,000.

## Conclusion

For the foregoing reasons, the Court will enter an order granting in part and denying in part the Plaintiffs' Motion for Declaratory Judgment and granting in part and denying in part the Guaranty Association's Counterclaim for Declaratory Relief.

The following declaratory relief will be granted:

1. Each of the minor claimants, Zachary Klurfeld and George MacDougall, has a claim against the Guaranty Association for his personal injuries. The parents or guardians of the minors have a separate claim for medical expenses;

2. Any payments made to the plaintiffs by insurers providing health insurance coverage or benefits for treatment of injuries sustained in the accident reduce dollar for dollar any obligation the Guaranty Association has to pay covered claims asserted by such plaintiffs, excepting only the claims of the minor claimants for the minors' personal injuries;

3. The Guaranty Association's guarantee for each covered claim is capped at $300,000 per insolvent insurance policy, although each covered claim may greatly exceed this cap;

4. Any payments made to plaintiffs by solvent insurers for parties against whom plaintiffs have asserted liability for the claim in question reduce dollar for dollar any amount payable by the Guaranty Association on covered claims asserted by the plaintiffs;

5. Any payments made to the plaintiffs by insurers providing uninsured or underinsured motorist coverage for the claim reduce dollar for dollar any amount payable by the Guaranty Association on covered claims asserted by such plaintiffs;

6. Any amount payable by the Guaranty Association for the wrongful death of Scott Klurfeld, Janis Klurfeld, Russell Surratt, Inna Surratt, and Jacqueline Ernst cannot exceed $300,000 for each of the estates of such individuals per Reliance policy. The statutory beneficiaries of the decedents do not each have a separate covered claim;

7. The offsets to which the Guaranty Association is entitled are taken from the amount payable on a covered claim (i.e., the lesser of $300,000 or policy limits) and not from the verdict which a covered claimant may obtain against the insured of the insolvent insurer;

8. Any person having a claim against an insurer under any provision in an insurance policy, other than a policy of Reliance or United Pacific, is required to first seek recovery under the policy covered by the insurer that is not insolvent.